UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROYAL BENSON, M.D., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. H-04-04323 |
| | § | |
| ST. JOSEPH REGIONAL HEALTH | § | |
| CENTER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiffs' Second Motion to Compel (Docket # 142), Plaintiffs' Motion to Extend Time on the Deposition of Myesha Nichols-Turner (Docket # 145), and Plaintiffs' Motion to Extend Time on the Deposition of Kathleen Thomas (Docket # 146). Having reviewed the motions, the responses, and the arguments of counsel, the Court finds as follows:

**I. Plaintiffs' Second Motion to Compel**

*A. Peer Review Patient Charts*

In accordance with the Court's Order of December 22, 2005, Defendants have now produced a number of peer review documents relating to Plaintiff Royal Benson, M.D. ("Dr. Benson") and other physicians at Defendant St. Joseph Regional Health Center ("St. Joseph"). Among the materials that Defendants have produced are clinical review worksheets, physician recredentialing cover sheets, physician reappointment forms, physician database reports, copies of peer review letters sent to the physicians, and MAXSYS reports, which summarize the findings of reviewing physicians. As Defendants have explained, the information in the MAXSYS reports is provided by physician reviewers and entered by a nurse, and includes a patient number, an occurrence date, a quality of care indicator number, the severity of the

occurrence, the standard of care, a description of the occurrence, the age of the patient, whether the full record was reviewed, and whether it was reported to or reviewed by a committee.

Plaintiffs assert that, in addition to the peer review materials already provided by Defendants, they are entitled to the patient charts upon which the peer reviews were based. As Plaintiffs note, peer review includes a review of the charts of the patients treated by the physicians under review, and Plaintiffs contend that they need these underlying patent charts in order to make any meaningful comparison of Dr. Benson's peer review to that of the other physicians. Specifically, Plaintiffs allege that their experts cannot compare the manner in which Dr. Benson's patient charts were reviewed and graded to the manner in which other physicians' patient charts were reviewed and graded, without access to the patient charts themselves. Plaintiffs urge that such a comparative analysis will show that Defendants treated Dr. Benson more harshly than other physicians in the peer review process, which Plaintiffs allege demonstrates anticompetitive conduct on the part of Defendants.

In response, Defendants contend that Plaintiffs' request for the patient charts is overly broad and unduly burdensome. Defendants have produced peer review files for twenty-five physicians, each of which refers to the charts of over one hundred patients. Producing all of the patient charts referenced for all of the physicians would be a burdensome task. Additionally, Defendants argue that the patient charts for physicians other than Dr. Benson are irrelevant to Plaintiffs' antitrust claims. Defendants urge that, because Plaintiffs' antitrust claims rest upon how Dr. Benson personally was treated in the peer review process, and whether his peer reviewers could have reasonably concluded that he provided substandard care, an analysis of how Dr. Benson was treated in comparison to other physicians would not provide support for Plaintiffs' claims.

Defendants are correct that one relevant issue in an antitrust case such as this one is whether a physician's peer reviewers could have reasonably concluded that he provided substandard care. *See Willman v. Heartland Hosp. East*, 34 F.3d 605, 610-11 (8th Cir. 1994) (finding the proper question in an antitrust case to be not whether the physician actually provided substandard care, but rather, whether his peer reviewers could have reasonably found that he provided substandard care). Defendants have not provided any authority, however, for the proposition that this is the only issue relevant to claims of anticompetitive conduct, and that a comparison of how different physicians were treated by peer reviewers is therefore inappropriate. Nor have Defendants cited any authority for their contention that the patient charts referenced by the peer reviews are not discoverable.

On the contrary, an analysis of how Defendants treated Dr. Benson in the peer review process, in comparison to how Defendants treated other physicians in the peer review process, may be quite relevant to Plaintiffs' claims that Defendants acted with an anticompetitive intent. If Defendants in fact treated Dr. Benson more harshly than other physicians, this would seem to lend support to Plaintiffs' contention that Defendants acted with the intent to remove Dr. Benson as a competitor in the Brazos County OB/GYN market. Just as disparate treatment of an employee may provide evidence of a discriminatory motive in the context of employment discrimination claims, disparate treatment in the peer review process may be viewed as evidence of an anticompetitive motive in the antitrust context. Plaintiffs must demonstrate such an anticompetitive motivation or reasons in order to make out an antitrust claim. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 345 (5th Cir. 2002).

This view, that disparate treatment in the peer review process is relevant to claims of anticompetitive conduct, is also compatible with the decisions of other courts on the issue of peer review discovery. *Memorial Hospital v. Shadur*, for example, involved a physician's claim that

3

a disciplinary proceeding against him was a sham intended only as a means of restraining trade. 664 F.2d 1058, 1062-63 (7th Cir. 1981). To prove this allegation, the court found that the physician needed to produce "evidence that other physicians with comparable or worse records than his" were not similarly disciplined. *Id.* at 1063. Similarly, in *Swarthmore Radiation Oncology, Inc. v. Lapes*, the court recognized that "where the plaintiffs' theory turns on comparison of how the defendants treated similarly situated physicians, staff privileges records are unquestionably relevant." 1993 WL 517722 at *1 (E.D. Pa. 1993).

For these reasons, the Court finds that Defendants' treatment of other physicians in the peer review process is relevant to Plaintiffs' antitrust claims. The patient charts underlying the peer reviews of the other physicians are also relevant and necessary to Plaintiffs' comparison of Defendants' peer review treatment of Dr. Benson to that of other physicians. Accordingly, Plaintiffs' motion with respect to the patient charts is **GRANTED**, and Defendants are ordered to produce the patient charts referenced by the peer review files already provided to Plaintiffs.

The Court is mindful, however, of the expense of such a voluminous production of documents. The Court also recognizes the considerable discovery that has already been conducted in this case, as well as the expense and burden that this has imposed upon the parties. It is this Court's practice to observe the conduct of attorneys over a continuum of time. If the Court finds that any discovery was pursued in the absence of a good faith belief in its relevance and materiality, the Court will award costs to the party bearing the burden of such discovery. Such an award could include all costs incurred from the very beginning of the case.

## B. Correlation of Peer Review Sources

In addition to the patient charts, Plaintiffs seek to compel Defendants to produce a system for correlating the information from different peer review sources. Defendants have produced peer review materials from three sources: (1) the peer review files for the other physicians with

4

OB/GYN privileges at St. Joseph; (2) the files submitted to the American College of Obstetrics and Gynecology ("ACOG") for review; and (3) the resulting ACOG report. The documents from each of these sources use a different alphabetical or numerical system for designating the physicians to whom the materials pertain, without revealing their identities. Plaintiffs contend that correlating the designation of physicians in the sources is necessary to allow their experts to conduct a meaningful comparative analysis of the peer review materials, and that doing so will not reveal the identities of the individual physicians. Defendants argue that correlating the three sources will create a risk that the physicians' identities will be revealed, and that the different sources of peer review information have never been correlated by Defendants or by anyone else.

Although Defendants have never correlated the different peer review sources for their own purposes, such a correlation is now relevant to Plaintiffs' claims. Plaintiffs should have the ability to track how each physician was treated throughout the peer review process, and by different entities, in order to complete their comparison of Dr. Benson's treatment with that of the other St. Joseph physicians. While safeguarding the identities of the other physicians remains an important concern, Defendants have not shown specifically how correlating the three sources of peer review materials will reveal these identities. Plaintiffs' motion for a system of correlation is therefore **GRANTED**. Defendants are ordered to provide a system of correlation for the peer review materials, such that Plaintiffs can track which materials from each source correspond to the same physician.

## C. Other Peer Review Documents

Plaintiffs have moved to compel a number of additional categories of peer review documents, which they allege that Defendants have failed to produce. At a hearing on April 13, 2006, the Court noted that Defendants appear to have produced all requested documents in existence, and that materials relating to physicians in practices other than OB/GYN would not be

relevant to Plaintiffs' claims.  Plaintiffs agreed to forego their pursuit of the additional peer review documents set forth in their motion to compel.  This portion of Plaintiffs' motion is therefore **DENIED AS MOOT**.

*D. Separation Agreements*

In their requests for production of documents, Plaintiffs requested Defendants to produce all agreements arising out of the termination or departure of any Defendants from St. Joseph. Plaintiffs now seek to compel Defendants to produce the separation agreement pertaining to Defendant Daniel Buche, who Plaintiffs contend may have been terminated or induced to leave St. Joseph because of his involvement in the proceedings against Dr. Benson.  Plaintiffs contend that the separation agreement is potentially relevant to their claims that Dr. Benson's peer review proceedings were a sham designed to eliminate him as a competitor, and that it may show bias on the part of Mr. Buche.  Defendants assert in response that disclosing the separation agreement would violate privacy and confidentiality interests, and that the agreement is irrelevant to Plaintiffs' claims because Mr. Buche's departure from St. Joseph was not related to Dr. Benson in any way.

Plaintiffs have failed to present any factual basis for their speculation that Mr. Buche may have been terminated for mishandling Dr. Benson's case.  On the contrary, John O'Connell, who serves as President of the Franciscan Services Corporation and was involved in Mr. Buche's departure from St. Joseph, testified in his deposition that Mr. Buche's separation from St. Joseph was in no way related to Dr. Benson.  O'Connell Dep. 43:17-20, Nov. 29, 2005.  Plaintiffs' unsubstantiated speculation that Mr. Buche's separation agreement contains some reference to Dr. Benson is not enough to justify its disclosure.  Should Plaintiffs wish to show that Mr. Buche has a bias towards St. Joseph because he is receiving payments in accordance with the separation agreement, Plaintiffs may establish the existence and amount of any such payments by serving

6

Defendants with appropriate interrogatories. Disclosure of the agreement itself is not necessary to show a bias arising from severance payments, and Plaintiffs have not demonstrated the existence of any other type of bias on the part of Mr. Buche. With respect to the separation agreements, therefore, Plaintiffs' motion is **DENIED**.

*E. Electronic Discovery*

Plaintiffs contend that, although Defendants have produced some electronic discovery and privilege logs, Defendants have not explained how they searched archived material for documents and emails responsive to Plaintiffs' requests. Plaintiffs also allege that the production of an email inquiry from Ms. Schrader to Dr. Montgomery, with no reply email from Dr. Montgomery, shows that Defendants have not yet produced all existing electronic discovery. Plaintiffs move the Court to compel a full search of all individual Defendants' archived media for February and March 2002, and to compel Defendants to explain the efforts that they have undertaken to respond to Plaintiffs' electronic discovery requests.

Defendants have affirmed in filings with this Court, however, that they have already conducted the searches requested by Plaintiffs and have produced all responsive, non-privileged emails, in addition to privilege logs. Those Defendants who were deposed by Plaintiffs also testified that they conducted the requested searches of their files and found no responsive documents. The Court presumes, in the absence of any showing to the contrary, that the statements made by Defendants under oath and the statements made by Defendants' counsel to the Court were made with a good faith belief in their truthfulness. Additionally, Plaintiffs have failed to offer more than speculation to show that other responsive electronic documents or emails exist. As Defendants point out, that Defendants produced an email to which there was no electronic response does not indicate the existence of another email, as Dr. Montgomery may just as likely have responded to Ms. Schrader's inquiry by phone, in person, or not at all. Finally, it

7

is unnecessary for Defendants to explain the details of their method of searching, when they have certified and represented to the Court that they have complied fully with Plaintiffs' requests and made reasonable efforts to find and disclose all responsive documents and emails. Plaintiffs' motion to compel additional electronic searches is **DENIED**.

## II. Plaintiffs' Motions to Extend Time on Depositions

Plaintiffs have also moved to extend the time limits on the depositions of Defendants Myesha Nichols-Turner and Kathleen Thomas. Both Ms. Nichols-Turner and Ms. Thomas worked in St. Joseph's Quality Related Services ("QRS") Department, which administers and oversees the peer review process at St. Joseph. Plaintiffs argue that Ms. Nichols-Turner was a key player in the peer review process because she input the information contained in the MAXSYS reports. Likewise, Plaintiffs argue that Ms. Thomas played a key role in the peer review process because she served as the Director of QRS during Dr. Benson's peer review. Plaintiffs contend that, as the Director of QRS, Ms. Thomas was involved in the identification of which of Dr. Benson's cases were selected for review and which committees these cases were directed to for review, she routinely attended meetings of the various peer review committees as a representative of the QRS department, and she was the "bylaws expert" at St. Joseph.

While acknowledging that both Ms. Nichols-Turner and Ms. Thomas were involved with St. Joseph's peer review, the Court finds that Plaintiffs have not made a strong enough showing that additional deposition time is warranted with either Defendant. Plaintiffs have been aware of the roles of Ms. Nichols-Turner and Ms. Thomas in the QRS Department ever since Plaintiffs filed their Original Complaint, in which they named both Ms. Nichols-Turner and Ms. Thomas as Defendants. Plaintiffs have already spent two hours deposing Ms. Nichols-Turner and seven hours deposing Ms. Thomas. During this time, Plaintiffs appear to have covered most, if not all, areas of the two Defendants' involvement with St. Joseph's peer review process. Additionally,

the Court has already granted Plaintiffs great leniency in taking depositions and conducting discovery in this case. Instead of limiting the number of depositions taken by Plaintiffs to ten, as provided by Federal Rule of Civil Procedure 30(a)(2)(A), the Court has allowed Plaintiffs to take ten additional depositions of two hours each, for a total of twenty depositions. The Court also permitted Plaintiffs an additional five hours for the deposition of Dr. William Price, in addition to the seven hours provided by Federal Rule of Civil Procedure 30(d)(2).

Plaintiffs have failed to demonstrate that further extensions are warranted, or that additional deposition time is needed with either Ms. Nichols-Turner or Ms. Thomas. Accordingly, Plaintiffs' motions to extend the time limits on the depositions of Ms. Nichols-Turner and Ms. Thomas are **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 1st day of May, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**