UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROYAL BENSON, M.D. and BENSON OB/GYN CENTER, P.A., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-04-4323 |
| ST. JOSEPH REGIONAL HEALTH CENTER, et al., | § § § | |
| Defendants. | § § | |

<u>MEMORANDUM AND ORDER</u>

Pending before the Court are numerous motions for summary judgment and partial summary judgment brought by both Plaintiffs and Defendants. For the reasons set forth below, Defendants St. Joseph's et al.'s Motion for Summary Judgment and Counterclaim for Litigation Expenses (Doc. # 201), and Physician Defendants' Motion for Summary Judgment (Doc. # 203) are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' state law claims are **DISMISSED WITH PREJUDICE**. Defendants St. Joseph's et al.'s Motion for Partial Summary Judgment on Plaintiffs' Antitrust Claims (Doc. # 243) and Physician Defendants' Motion for Partial Summary Judgment on Plaintiffs' Antitrust Claims (Doc. # 248) are **GRANTED**. All other pending motions are **DENIED AS MOOT**.

## I. BACKGROUND

This case arises out of the decision of St. Joseph Regional Health Center ("SJRHC" or "Hospital") to non-renew the clinical privileges of Royal Benson, M.D., a doctor of obstetrics and gynecology ("OB/GYN"), in March 2002. Dr. Benson filed suit against the Hospital and several Hospital employees and physicians who participated in the Hospital's peer review

process alleging antitrust violations, breach of contract, tortious interference with existing and prospective contracts, defamation, and business disparagement.  The defendants remaining in the action at this time are four institutional entities,[1] five Hospital employees,[2] and seven physicians ("Physician Defendants").[3]

The relevant narrative begins in January 1992 when Dr. Benson joined the Brazos Valley Women's Center ("BVWC") as an associate OB/GYN.  Around that same time, Dr. Benson first obtained privileges to practice in the Department of Obstetrics and Gynecology at SJRHC. Clinical privileges at SJRHC are granted on a two-year basis, and application for reappointment is required at the end of each term.

Dr. Benson practiced at the BVWC as an associate for four and one-half years before becoming the third partner in the practice.  In 1997, however, there was apparently a falling out between Dr. Benson and some of the other BVWC physicians, and Dr. Benson was asked to leave the practice.

After an acrimonious departure from the BVWC, Dr. Benson formed his own practice, Benson OB/GYN Center, P.A., which is a plaintiff in this case.  He also continued to exercise his privileges at SJRHC, which had been continually renewed every two years.  However, in 1999, the Hospital began documenting concerns about the quality of care provided by Dr. Benson.  He became the subject of frequent peer review by the chairs of the OB/GYN Department and the OB Review Committee.

Dr. Benson's regular clinical privileges were set to expire in September 2001.  Just one month earlier, the Hospital's Medical Executive Committee ("MEC") had voted to request an

---

[1] SJRHC, St. Joseph Services Corporation d/b/a St. Joseph Health System, Franciscan Services Corporation, and Sisters of St. Francis of Sylvania, Ohio.
[2] Daniel Buche, Sister Gretchen Kunz, Myesha Nichols-Turner, R.N., Alan C. Smith, and Kathleen A. Thomas.
[3] Betty Acker, M.D., Thomas W. Davis, M.D., Daniel Dawson, M.D., David R. Doss, M.D., Robert H. Emmick, Jr., M.D., G. Mark Montgomery, M.D., and William F. Price, M.D.

outside review of the Obstetrics Department by a survey team from the American College of Obstetricians and Gynecologists ("ACOG"), so the Hospital's Credentials Committee recommended that all physicians in the OB/GYN department who applied for reappointment in September 2001 be reappointed for six months, rather than the typical two years, pending the results of the ACOG survey.  On December 4, 2001, Dr. Benson was informed by letter that his application for reappointment had been approved for six months pending the ACOG team's findings (Physician Defs.' Mot. Summ. J. Ex. 7).

The ACOG team conducted a review of the quality of care of St. Joseph's OB/GYN Department between November 15 and 18, 2001, and reported its findings in January 2002 (Physician Defs.' Mot. Summ. J. Ex. 28).  The OB/GYN Department then created an Ad Hoc ACOG Review Committee to review the ACOG report and make recommendations.  The ACOG report was critical of Dr. Benson, and as a result, the Ad Hoc ACOG Review Committee recommended to the Hospital's Credentials Committee that Dr. Benson's privileges not be renewed.  The Credentials Committee then recommended to the MEC that Dr. Benson not be reappointed.

On March 7, 2002, Dr. Benson was asked to participate in a MEC discussion of the portions of the ACOG report pertaining to him (Physician Defs.' Mot. Summ. J. Ex. 32).  That discussion took place on March 14, 2002, and Dr. Benson was afforded the opportunity to address a number of criticisms contained in the ACOG report.  After the meeting, a doctor on the MEC allegedly assured Dr. Benson that "everything will turn out alright" (Royal Benson Aff. ¶ 48).

On March 19, 2002, however, the MEC voted to recommend non-renewal of Dr. Benson's privileges and to forward this recommendation to the Hospital's Governance Council.

Dr. Benson was notified of the MEC's recommendation by letter on March 21, 2002, and was told that he had a right to request a hearing on the matter (Physician Defs.' Mot. Summ. J. Ex. 33). His six-month reappointment privileges expired four days later, on March 25, 2002, after which date Dr. Benson could no longer practice at SJRHC.

Dr. Benson did request a hearing regarding his non-renewal, and fourteen hearing sessions were conducted between July 9, 2002, and April 16, 2003. After the hearings, the MEC again voted to recommend that Dr. Benson not be reappointed. Dr. Benson sought appellate review before the St. Joseph Governance Council, which, on November 15, 2004, voted to reappoint Dr. Benson for one year subject to a set of conditions. Dr. Benson's new privileges took effect on April 6, 2005, after more than three years of inability to practice at SJRHC.

Dr. Benson argues that the peer reviews and the decision to non-renew his privileges were tainted by the participation of several physicians with connections to the BVWC who held personal grudges against him. He is seeking, *inter alia*, lost profits damages for the time he was unable to practice at SJRHC, as well as damages for emotional distress. Defendants maintain that participants in a peer review process are immune from suits for damages under both federal and state law, and have moved for summary judgment on this ground, as well as on the merits of each of Plaintiffs' substantive claims.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255.

### III. QUALIFIED IMMUNITY

All Defendants have moved for summary judgment on the ground that participants in a peer review process are immune from damages liability under the federal Health Care Quality Improvement Act ("HCQIA") and the Texas Medical Practices Act ("TMPA"). If the requirements for HCQIA immunity are met, then the peer review participants cannot be liable in damages under federal or state law. If the requirements for TMPA immunity are met, then the peer review participants are immune from all civil liability under state law.

### A. HCQIA

HCQIA provides immunity from damages for "professional review actions" that are taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a) (2006). A professional review action is presumed to meet these standards unless the presumption is rebutted by a preponderance of the evidence. *Id.* Thus, at the

summary judgment stage, the burden is on a plaintiff to produce evidence that would allow a reasonable jury to conclude by a preponderance of the evidence that a professional review action failed to meet the HCQIA standards. *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3d Cir. 1999).

> HCQIA defines a "professional review action" as

>> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9) (2006).  Dr. Benson contends that Defendants engaged in two distinct professional review actions that do not qualify for HCQIA immunity.  The first, Plaintiffs urge, was the decision of the Credentials Committee  in late 2001 to renew Dr. Benson's clinical privileges at SJRHC for only six months, rather than the typical two years.  However, the parties offer vastly differing interpretations of this event.  Dr. Benson argues that his application for reappointment in September 2001 was approved for two years, but that his privileges were then summarily interrupted and restricted to six months by the letter of December 4, 2001. Defendants, on the other hand, claim that Dr. Benson's September 2001 application for reappointment was never approved for two years.  They maintain that the Credentials Committee decided to *extend* Dr. Benson's existing privileges, along with the privileges of three other physicians up for renewal in September 2001, for an additional six months to permit the ACOG survey to be conducted before making reappointment decisions.

The Court is persuaded that Defendants' interpretation of this event is the more likely scenario, given the fact that Dr. Benson was never informed that his application for

reappointment had been approved for two years.  Under this interpretation, the decision to extend Dr. Benson's privileges for six months does not constitute a professional review action because such an action, by definition, must adversely affect clinical privileges; an extension of privileges is certainly not adverse.

Even if the Court were to operate under Dr. Benson's interpretation, however, and assume that his privileges were renewed for two years followed by a subsequent restriction to six months, that decision still would not constitute a professional review action under the statute. The definition of "professional review action" requires that the action be based on the competence of an individual physician.  *Id.*  Dr. Benson has provided no evidence that the Credentials Committee's decision to "restrict" the privileges of Dr. Benson *and the three other physicians* up for reappointment was based on an evaluation of their competence.  In fact, that the decision was applied across the board to all OB/GYN physicians up for reappointment suggests that it was based on administrative, rather than competency, concerns.  Because the decision to "restrict" Dr. Benson's privileges from two years to six months, if there was in fact such a decision, was not based on his individual competence, it does not constitute a professional review action for purposes of HCQIA.

The second professional review action that Plaintiffs identify is the MEC vote to recommend that Dr. Benson's privileges be non-renewed that occurred on March 19, 2002. Defendants agree that this recommendation constituted a professional review action for purposes of HCQIA, but contend that it met the four requirements for immunity.  Plaintiffs bear the burden of overcoming the presumption that each of the four elements was satisfied.

In their Supplemental Brief on the HCQIA immunity issue, Plaintiffs appear to concede that, under the current state of the law and prevailing objective reasonableness standard,[4] they cannot produce sufficient evidence to overcome the presumption that Defendants satisfied the first, third, and fourth elements of HCQIA immunity.  Plaintiffs urge this Court to reinterpret the meaning of "reasonable" as used in the statute so as to permit evidence of personal animosity by peer reviewers, but this Court is not inclined to say that nearly fifteen years of overwhelmingly uniform precedent on this point is wrong.   Thus, it must conclude that Plaintiffs have not produced sufficient evidence to rebut the presumption that Defendants acted in the reasonable belief that the action was in furtherance of quality healthcare, after a reasonable effort to obtain the facts of the matter, and in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts.

Rather than attack Defendants' actions under the first, second, and fourth prongs of HCQIA immunity, Plaintiffs, in their Supplemental Brief, instead focus their argument on the third prong, contending that adequate notice and hearing procedures were not afforded to Dr. Benson.  HCQIA sets forth in detail certain "safe harbor" provisions that a health care entity must follow in order for its notice and hearing procedures to be deemed adequate as a matter of law.  *See* § 1112(b).  These safe harbor provisions require the health care entity, *inter alia*, to provide notice of the proposed action and to permit the physician to request a hearing on the matter.  *Id.*  All is not lost for the health care entity if it fails to meet the safe harbor provisions,

---

[4] See *Austin v. McNamara*, 979 F.2d 728 (9th Cir. 1992), which explained that "the legislative history of § 11112(a) indicates that its reasonableness requirements were intended to create an objective standard rather than a subjective good faith standard."  *Id.* at 734.   The Court went on to conclude that, under such a standard, a physician's "assertions of hostility do not support his position because they are irrelevant to the reasonableness standards of § 11112(a).  The test is an objective one, so bad faith is immaterial.  The real issue is the sufficiency of the basis for the defendant's actions."  *Id.*

however, as the third prong of HCQIA immunity can also be satisfied by "such other proceedings as are fair to the physician under the circumstances."  § 11112(a)(3).

It appears to be undisputed that the procedures surrounding the MEC's vote to recommend non-renewal of Dr. Benson's privileges on March 19, 2002, did not fall within the bounds of the safe harbor provisions set forth in the statute.  Dr. Benson was not given notice of the impending vote before the MEC's meeting, for instance, nor was he permitted to have a hearing with a lawyer present before the vote took place.  Defendants themselves appear to acknowledge their failure to follow the safe harbor provisions, as they argue instead that the procedures leading up to the MEC's vote were fair under the circumstances.  However, whether the procedures Dr. Benson received were fair under the circumstances is a classic jury question. *See, e.g.*, *Schindler v. Marshfield Clinic*, 2006 WL 2944703, at *16-17 (W.D. Wis. Oct. 12, 2006) ("Again, the issue is the reasonableness of the procedures afforded to plaintiff before his termination. Were they fair? Were they adequate? These are questions not amenable to resolution on summary judgment."); *Islami v. Covenant Med. Ctr., Inc.*, 822 F. Supp. 1361, 1377-78 (N.D. Iowa 1992) ("For the court to say whether the proceedings were fair in the circumstances at this juncture would require the court to draw numerous inference and weigh the evidence of the parties; a process which is anathema to summary judgment decisions.").

While it is true that Defendants enjoy a presumption that their procedures were fair under the circumstances, the Court is persuaded that Dr. Benson has produced sufficient evidence for a jury to conclude that that presumption has been rebutted by a preponderance of the evidence.  A jury may be of the opinion that it was unfair that Dr. Benson was not informed that there was going to be vote regarding his clinical privileges, or that he was not told that his privileges were at stake before he met with the MEC to discuss the ACOG findings on March 14, 2002.  On the

other hand, a jury might believe, as Defendants contend, that Dr. Benson was given ample opportunities to present his side of the story and should have known that there was going to be a vote on his clinical privileges by virtue of the fact that his existing privileges were only four days from expiration.  Whether the procedures afforded Dr. Benson were fair under the circumstances is a fact question that must be determined by a jury.[5]  Thus, because Plaintiffs have raised a question of fact regarding the third requirement for HCQIA immunity, Defendants' motion for summary judgment on HCQIA immunity grounds must be **DENIED**.

### B. TMPA

Defendants also contend that they are immune from civil liability for state law claims under the Texas Medical Practices Act, *Tex. Occ. Code* § 160.010(a)(2) (Vernon 2004).  Texas has taken the additional step, authorized by HCQIA, of providing additional protection for medical peer review activity.  The TMPA bestows immunity on a peer review participant as long as the participant "acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to the person."  *Id.*  There is a statutory presumption that the participant acted without malice, *Maewal v. Adventist Health Sys.*, 868 S.W.2d 886, 893 (Tex. App.—Fort Worth 1993, writ denied), so a plaintiff bears the burden of overcoming that presumption by clear and convincing evidence, *Monroe v. AMI Hosp. of Tex., Inc.*, 877 F. Supp. 1022, 1030-31 (S.D. Tex. 1994).  Malice, for purposes of the TMPA, is defined as "knowledge that an allegation is false or [] reckless disregard for whether the allegation is false."  *Johnson v. Hosp. Corp. of Amer.*, 95 F.3d 383, 395 (5th Cir. 1996) (citing *Maewal*, 868 S.W.2d at 893).  Thus, the Fifth Circuit has explained that, in order to overcome the TMPA immunity presumption, a plaintiff must show that a peer review participant knew that

---

[5] The Court is mindful that, while unresolved subsidiary factual questions regarding HCQIA immunity may be submitted to a jury, the ultimate question of whether a defendant is entitled to HCQIA immunity is a question of law.  *Bryan v. James E. Holmes Regional Medical Ctr.*, 33 F.3d 1318, 1332 (11th Cir. 1994).

the allegations against the physician that led to his suspension or non-renewal were false, or acted with reckless disregard for the falsity of those allegations. *Id*.

The allegations that led to Dr. Benson's nonrenewal were, according to the MEC's letter of March 21, 2002, the concerns identified in the ACOG report (Physician Defs.' Mot. Summ. J. Ex. 33 at 1). The ACOG report indicated that sixteen of Dr. Benson's patient charts were reviewed, and all sixteen were rated unsatisfactory: three were found to have unsatisfactory documentation, two were cited for unsatisfactory management, and eleven were rated as unsatisfactory in both documentation and management (Physician Defs.' Mot. Summ. J. Ex. 28 at 19-35). The ACOG report concluded that Dr. Benson's charts exhibited a trend of "grossly inadequate documentation" (Physician Defs.' Mot. Summ. J. Ex. 28 at 41), and that there were consistent indications of inadequate care[6] (Physician Defs.' Mot. Summ. J. Ex. 28 at 43). The ACOG report also concluded that Dr. Benson appeared to be "unwilling or unable to accept peer review as an educational process" (Physician Defs.' Mot. Summ. J. Ex. 28 at 45). Because these are the allegations on which the MEC's decision to non-renew Dr. Benson was based, in order to raise a fact issue as to actual malice, Plaintiffs must produce evidence that Defendants knew that these allegations were false, or acted on them with reckless disregard for their falsity.

Plaintiffs argue that they have produced sufficient evidence to rebut the presumption that Defendants acted without actual malice. They have offered evidence that Dr. Benson was treated more harshly than other physicians who committed similar conduct, which, they argue, demonstrates that Defendants knew that Dr. Benson was not incompetent. They also contend that the Defendants' actions were driven by ulterior motives, namely the alleged desire of the

---

[6] Specifically, the ACOG report cited surgery that was not indicated, poor judgment in laproscopic procedures, not anticipating complications, poor clinical management demonstrating substandard care that does not reflect ACOG's guidelines, poor management potentially exposing the mother and infant to iatrogenic injury, and questionable surgery performed in a patient with a presumed absence of her gynecologic organs (Physician Defs.' Mot. Summ. J., Ex. 28 at 43).

BVWC physicians to drive Dr. Benson out of practice.  Finally, Plaintiffs offer the reports of their experts, Dr. William Winslade and Dr. John Dale Dunn, who opine that the peer review process was done in bad faith.

None of this evidence, however, suggests that the allegations in the ACOG report were false, much less that Defendants knew they were false or acted with reckless disregard for their falsity.  In fact, Plaintiffs have never argued that the ACOG findings were false.  They have argued that the process was unfair, biased, and motivated by vengeance, but they have never disputed ACOG's factual findings of inadequate documentation and patient care.  Even if Dr. Benson was treated more harshly than other physicians who engaged in similarly deficient conduct, it would not establish that ACOG's findings that Dr. Benson exhibited  inadequate documentation and patient care were false.  Similarly, even if the peer review process was, in fact, motivated by vengeance, that would not constitute evidence that the allegations of inadequate documentation and  patient care were untrue.  Texas has taken the position in the TMPA that the actual motives underlying peer review actions are irrelevant as long as those actions are not based on false allegations; if a physician is truly deficient or incompetent, the law is not concerned with potential motives of his or her peer reviewers.  Thus, Plaintiffs' evidence of disparate treatment and  ulterior motives is not sufficient to raise a fact question as to actual malice.

Similarly, the opinions of Plaintiffs' experts fail to create a fact question regarding actual malice.  First, it should be noted that neither of the experts whom Plaintiffs offer on this issue are specialists in obstetrics or gynecology.  Second, neither expert opines that ACOG's allegations of inadequate documentation and patient management were false.  Dr. John Dale Dunn states that he is "not aware" of any prior "significant" disciplinary or peer review events against Dr.

Benson, and that Dr. Benson has not had any "significant" malpractice problems (Expert Report of John Dale Dunn, M.D., J.D 3-4).  This faint praise does not refute ACOG's factual findings. Dr. William J. Winslade states that Dr. Benson has had no malpractice verdicts against him (Expert Report of William J. Winslade, M.D., J.D. 4), but says nothing about whether malpractice cases were filed or settled.  Dr. Winslade does state in vague generalities that Dr. Benson "achieved exemplary success" (Winslade Report 4), but offers by way of substantiation only the unsupported assertions that Dr. Benson had no bad outcomes and provided patient-centered care (Winslade Report 4).  Dr. Winslade offers many opinions regarding Defendants' ulterior motives and the faulty peer review procedures, but as explained above, neither criticism has any bearing on the truth or falsity of the ACOG findings.

Plaintiffs attempt to survive the actual malice inquiry by relying on the premise that "inadequate investigation coupled with the presence of ulterior motives may be sufficient to raise a fact issue as to actual malice."  *Poliner v. Tex. Health Sys.*, 2003 WL 2225567, at *15 (N.D. Tex. Sept. 30, 2003).  Plaintiffs argue that they have produced evidence that Defendants, particularly the BVWC physicians, had an ulterior motive to run Dr. Benson out of practice, and that the Hospital's investigation of Dr. Benson was inadequate because it was conducted in significant part by those harboring the ulterior motive.  However, the ACOG survey on which the decision to non-renew Dr. Benson was based was conducted by an independent team of physicians from outside the Hospital who specialize in obstetrics and gynecology.  None of the ACOG team members was personally familiar with Dr. Benson, and the team's chart study was a blind one, meaning that the treating physicians' names were removed before ACOG evaluation. Under these circumstances, it cannot reasonably be asserted that the ACOG study was an inadequate investigation.  In those cases where courts have held that there was an inadequate

investigation, the inadequacy is glaring. *See Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333-34 (10th Cir. 1996) (noting that only two of the physician's charts were reviewed before his privileges were revoked); *Poliner*, 2003 WL 2225567 at *15 (citing a complete failure to investigate before summarily suspending physician's privileges). The facts of this case could not be more inapposite. Because the ACOG team's investigation of SJRHC's OB/GYN Department was independent and thorough, Plaintiffs cannot raise a fact issue as to actual malice by way of inadequate investigation and ulterior motives.

In sum, Plaintiffs have failed to provide sufficient evidence to overcome the presumption that Defendants did not act with malice in deciding to non-renew Dr. Benson's privileges. The allegations on which Dr. Benson's non-renewal was based were the ACOG findings that Dr. Benson exhibited a pattern of inadequate documentation and patient management, and Plaintiffs have not produced any supportable evidence that those allegations were false. The evidence of disparate treatment and ulterior motives that Plaintiffs have produced is irrelevant to the actual malice inquiry because such evidence does not cast doubt on the veracity of the underlying allegations. The ACOG report was the result of a thorough, independent investigation of the entire OB/GYN department, and Dr. Benson's non-renewal was based on the negative evaluation of Dr. Benson's practice that it contained. Because there is no evidence that the ACOG allegations were false, or that Defendants knew they were false or acted with reckless disregard for their falsity, Defendants' motion for summary judgment on TMPA immunity grounds must be **GRANTED**. Plaintiffs' state law claims are therefore **DISMISSED WITH PREJUDICE**.

## IV. ANTITRUST CLAIMS

Because Plaintiffs' state law claims are disposed of by Defendants' TMPA immunity, Plaintiffs' only remaining claims are the federal antitrust claims under the Sherman Act.

Plaintiffs allege that Defendants engaged in a conspiracy to restrain trade in violation of Section 1 of the Sherman Antitrust Act.  15 U.S.C. § 1 (2006).  In addition, Plaintiffs allege that Defendants monopolized or attempted to monopolize the local OB/GYN market in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2 (2006).  All Defendants have moved for partial summary judgment on Plaintiffs' antitrust claims.[7]

## A. Standing

Defendants begin by challenging Plaintiffs' standing to bring the antitrust claims. Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, that is, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). First, Defendants argue that Dr. Benson fails the second standing prong because he has not suffered an antitrust injury.  Second, Defendants contend that the third standing prong is also unsatisfied because Dr. Benson and his practice are not proper antitrust plaintiffs.

### 1. Antitrust injury

The Supreme Court has described the second antitrust standing prong, "antitrust injury," as

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Res. Inc.*, 395 U.S. 100, 125 (1969)).  The Fifth Circuit has emphasized the

---

[7] Defendants St. Joseph's et al.'s Motion for Partial Summary Judgment on Plaintiffs' Antitrust Claims (Doc. # 243) and Physician Defendants' Motion for Partial Summary Judgment on Plaintiffs' Antitrust Claims (Doc. # 248).

distinction between antitrust injury in the standing context and injury to competition, which is a component of substantive liability. *Doctor's Hosp.*, 123 F.3d at 305. Antitrust injury for standing purposes "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Id.* A plaintiff need not establish a market-wide injury to competition as an element of standing. *Id.* The standing inquiry asks merely whether the plaintiff's alleged losses fall within the conceptual bounds of antitrust injury, regardless of the ultimate merits of the claim. *Id.* Mindful of this distinction, the Fifth Circuit has cautioned district courts against granting summary judgment on standing grounds when they really mean to say that no antitrust violation has occurred. *Id.* at 306.

In this case, Defendants argue that Dr. Benson has not met the antitrust injury standing requirement because he has not shown an adverse effect on quality of care, patient choices, or prices in the OB/GYN market in Brazos County. A number of other district courts faced with antitrust claims brought by physicians whose hospital privileges were revoked have granted summary judgment for defendants on standing grounds based on similar arguments. *See, e.g.*, *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1009 (S. D. Tex. 1997); *Baglio v. Baska*, 940 F. Supp. 819, 829-30 (W.D. Penn. 1996); *Leak v. Grant Med. Ctr.*, 893 F. Supp. 757, 763-64 (S.D. Ohio 1995); *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 997-99 (N.D. Ga. 1992). However, this Court is mindful of the Fifth Circuit's admonition that the actual impact of a defendant's conduct on overall competition is better left to the merits determination. *See Doctor's Hosp.*, 123 F.3d at 306. Because the exclusion of a doctor from a hospital facility could theoretically result in decreased competition in the marketplace, and decreased competition

is, conceptually, the type of injury the antitrust laws were intended to prevent, Dr. Benson has satisfied the second standing prong.

## 2. Proper antitrust plaintiff

Defendants argue that even if Plaintiffs establish a sufficient antitrust injury to survive the second standing prong, they still fail to satisfy the third standing requirement, which is proper plaintiff status.  This requirement ensures that other parties are not better situated to bring suit. In determining the proper plaintiff, courts generally consider a number of factors, including (1) the directness of the asserted injury, that is, the chain of causation between the injury and the alleged unlawful restraint; (2) the nature of the harm; (3) the speculativeness of the alleged injury; (4) the difficulty of identifying damages and apportioning them among direct and indirect victims of the alleged conduct, in order to avoid duplicative recoveries; and (5) the causal connection between the violation and the harm.  *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).

Defendants argue that if there was, in fact, decreased competition among OB/GYN doctors in Brazos County that resulted in decreased patient choice and increased prices, the proper parties to bring an antitrust suit would be patients and third-party payors.  These would be the parties who would actually be injured by the Defendants' allegedly unlawful conduct.  A number of district courts, considering the factors enumerated above, have agreed with this argument.  *See, e.g.*, *Ginzburg*, 993 F. Supp. at 1020 ("Assuming . . . [that] the decrease in quality of care provided to Memorial patients and the reduction in patient choice options has in fact occurred, then it would be Memorial's patients and the third party payors, not [Dr.] Ginzburg, who are actually injured by Defendants' allegedly unlawful conduct."); *Baglio*, 940 F. Supp. at 830 ("It is these patients and the larger payor community who would be directly injured

by the alleged antitrust violations, and therefore they must bring an action on their own behalf.");

*Robles*, 785 F. Supp. at 999 ("two more easily imagined efficient enforcers in this case are obstetric patients and the government").  This Court, too, is persuaded that patients, insurance companies, or the government would all be better situated to bring suit for the injuries that Dr. Benson alleges have occurred.  Dr. Benson argues, however, that these parties may not yet be aware of the injuries they are suffering, and hence Plaintiffs are in the best position to bring suit at this time.  Rather than resolve this dispute, the Court will assume that Plaintiffs have standing to bring their antitrust claims and proceed to analysis on the merits, because, as explained below, both claims fail as a matter of law.

### B. Section 1 of the Sherman Act

In order to prevail on a claim for unreasonable restraint of trade brought under Section 1 of the Sherman Act, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market. *Johnson v. Hosp. Corp. of Amer.*, 95 F.3d 383, 392 (5th Cir. 1996).  Defendants challenge Plaintiffs' claim on all three of these grounds.  The most obvious deficiency in Plaintiffs' claim is the failure to produce any evidence of an anti-competitive effect to satisfy the second element, so the Court will begin there.

In order to determine whether the allegedly unlawful conduct of defendants produces some anti-competitive effect, courts apply the "rule of reason."  *Doctor's Hosp.*, 123 F.3d at 307.  This rule determines whether "the restraint imposed is such as merely regulates and perhaps promotes competition or whether it is such as may suppress or even destroy competition."  *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  Under the rule, a plaintiff must prove that the defendants' activities, on balance, adversely affected competition in the

relevant product and geographic markets.  *Id.*   The adverse effect must be on competition in general, and "not just 'on any individual competitor or on plaintiff's business.'"   *Ginzburg*, 993 F. Supp. at 1009 (quoting *Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 960 (10th Cir. 1990)).

In this case, Dr. Benson asserts that his exclusion from SJRHC resulted in decreased competition and available alternatives for patients.  Specifically, Dr. Benson alleges that because four insurance providers have exclusive contracts with SJRHC and only pay for procedures undertaken there, he lost numerous patients who could not afford the out of network insurance costs associated with having procedures performed at The College Station Medical Center.[8]  But there are twenty-four insurance carriers providing coverage in Brazos County, and Dr. Benson was able to redirect the majority of his practice to The Med and The Physician's Centre.  A patient who wanted to be treated by Dr. Benson was still able to choose his services at one of the alternate locations, and a patient who wanted to be treated at SJRHC could choose from more than twenty OB/GYN physicians with privileges there.  The small number of patients who wanted to be treated by Dr. Benson but were covered by insurance with an exclusive SJRHC contract would still have been able to choose Dr. Benson's services if they wished.  This is simply not evidence that patient alternatives were diminished in any way, or that there was any adverse effect on competition in the market as a whole.

Dr. Benson also attempts to demonstrate an adverse effect on competition with evidence that his deliveries fell from 123 in 2001 to 86 in 2003, while his hospital admissions fell from 314 in 2001 to 243 in 2003.  He alleges that, as a consequence, he lost $1,119,617.58 in patient charges and payments between March 2002 and January 2007.  While this evidence suggests that

---

[8] The College Station Medical Center (known as "The Med") is the only other full-service hospital in the Brazos County area.  A third medical center, The Physician's Centre, provides facilities for gynecological procedures, but does not have facilities for obstetrics.

his non-renewal had a negative impact on his individual practice, it has absolutely no bearing on competition in the market as a whole. Courts have repeatedly emphasized that the adverse effect must be on competition in general, not just on the plaintiff's individual business. *See, e.g.*, *Ginzburg*, 993 F. Supp. at 1009. None of Plaintiffs' evidence suggests that competition for OB/GYN services in Brazos County was adversely affected by Dr. Benson's non-renewal at SJRHC. Thus, Defendants' motions for summary judgment on Plaintiffs' Section 1 antitrust claim are **GRANTED**.

### C. Section 2 of the Sherman Act

Plaintiffs also claim that Defendants are guilty of both attempted and actual monopolization in violation of Section 2 of the Sherman Act. Defendants have moved for summary judgment on both claims.

### 1. Attempted monopolization

To prevail on an attempted monopolization claim, a plaintiff must prove (1) predatory and exclusionary conduct by the defendants; (2) a specific intent of the defendants to monopolize the relevant market; and (3) a dangerous probability of the defendants achieving monopoly power. *Surgical Care Ctr. of Hammond v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 839 (5th Cir. 2002) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). Defendants argue that they did not engage in predatory conduct and had no intent to monopolize the market, but that even if they did, they did not have the *capacity* to monopolize the market. The Court agrees.

In order to demonstrate that defendants have the capacity to achieve, let alone a dangerous probability of achieving, monopoly power, a plaintiff must provide evidence that defendants possess some legally significant share of the market. *Domed Stadium Hotel, Inc. v.*

*Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (going on to note that "a market share of less than ten percent, as a matter of law, usually will not support a finding of attempt to monopolize"). Here, however, Plaintiffs have not provided any evidence regarding the share of the Brazos County OB/GYN market possessed by Defendants. They allege that the Physician Defendants combined to serve a "significant portion" of the market (Pls.' Resp. to Defs.' Mot. Partial Summ. J. 38), but that assertion is not supported by any evidence. Plaintiffs' economic expert offered no opinion regarding the market power of Defendants. Without any evidence regarding Defendants' market power, Plaintiffs cannot raise a fact question regarding Defendants' capacity to achieve monopoly power. Thus, Plaintiffs' claim of attempted monopolization fails as a matter of law.

## 2. Actual monopolization

To establish actual monopolization, a plaintiff must show (1) the possession of monopoly power in the relevant market, and (2) that such power was willfully acquired, rather than developed as a consequence of a superior product, business acumen, or historic accident. *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1117 (5th Cir. 1984) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Monopoly power is "the power to control price or exclude competition." *Am. Airlines*, 743 F.2d at 1117 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). While the precise market share a defendant must control to be guilty of monopolization is unclear, the Fifth Circuit has remarked that, "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Domed Stadium Hotel*, 732 F.2d at 489.

In this case, Dr. Benson alleges that the Physician Defendants collectively, through their association with the BVWC, possess monopoly power in the OB/GYN market in Brazos County.

But again, Plaintiffs have provided absolutely no evidence, either themselves or through their economic expert, of the market share controlled by these Physician Defendants.  Without any evidence of the Physician Defendants' market share, there is no evidence that they possess monopoly power, and so Plaintiffs' actual monopolization claim against them fails as a matter of law.

Plaintiffs also allege that SJRHC possesses monopoly power with respect to hospital services in Brazos County.  To support this assertion, Plaintiffs rely on evidence that, in 2001, SJRHC reported 2500 deliveries, while The Med, the only other hospital in the county with obstetrics facilities, reported just 645 deliveries.  Even if this were evidence of a market share sufficient to constitute monopoly power, Plaintiffs have provided no evidence that this market share was the result of a willful acquisition rather than other, lawful factors—such as more expansive facilities, for instance.  Thus, because Plaintiffs have not produced sufficient evidence to raise an issue of fact on each element of their actual monopolization claim against SJRHC, the claim fails as a matter of law.

All Defendants' motions for partial summary judgment on Plaintiffs' claims for attempted and actual monopolization under Section 2 of the Sherman Act are **GRANTED**.

## V. CONCLUSION

Defendants are entitled to immunity from state civil liability under the TMPA, so Plaintiffs' state law claims must be dismissed.  A fact issue exists as to whether Defendants are entitled to immunity from federal damages liability under HCQIA, but Plaintiffs' federal antitrust claims fail as a matter of law, so the HCQIA immunity issue need not be presented to a jury.  Thus, Defendants St. Joseph's et al.'s Motion for Summary Judgment and Counterclaim for Litigation Expenses (Doc. # 201) and Physician Defendants' Motion for Summary Judgment

(Doc. # 203) are **GRANTED IN PART AND DENIED IN PART**.  Plaintiffs' state law claims are **DISMISSED WITH PREJUDICE**.  Defendants St. Joseph's et al.'s Motion  for Partial Summary Judgment on Antitrust Claims (Doc. # 243) and Physician Defendants' Motion for Partial Summary Judgment on Antitrust Claims (Doc. # 248) are **GRANTED**.  All other pending motions are **DENIED AS MOOT**.

   **IT IS SO ORDERED.**

   **SIGNED** this 22nd day of March, 2007.

                   _____

                   KEITH P. ELLISON
                   UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**
